# In the United States Court of Federal Claims

No. 15-946T
(Filed: March 3, 2017)*
**\*Opinion originally filed under seal February 24, 2017**

<table>
<tr><td>

JOHN P. McMANUS,

            Plaintiff,

v.

THE UNITED STATES,

            Defendant.

</td><td>

)
)
)
)
)
)
)
)
)
)
)
)

</td><td>

Tax Refund Suit; Summary Judgment;
RCFC 56; U.S.-Ireland Tax Treaty

</td></tr>
</table>

*Mark T. Curry*, Houston, TX, for plaintiff.  *Terry M. Giles*, Houston, TX, of counsel.

*Jason Bergmann*, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, DC, with whom were *Caroline D. Ciraolo*, Principal Deputy Assistant Attorney General, *David I. Pincus*, Chief, Court of Federal Claims Section, and *Mary M. Abate*, Assistant Chief, Court of Federal Claims Section, for defendant.

## O P I N I O N

**FIRESTONE**, *Senior Judge.*

Pending before the court in this tax refund case are cross-motions for summary judgment pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC") filed by plaintiff John P. McManus and defendant the United States ("the government").  Mr. McManus's tax refund claim arises in connection with a three-day backgammon match that took place in the United States.  Following the match, Mr. McManus reported gambling winnings of $17,400,000 as "United States source income" for 2012.  Pl.'s

Mot. for Summ. J. 1 ("Pl.'s MSJ"), Exs. 3, 5.[1]  Before Mr. McManus was paid his

gambling winnings, $5,220,000 was withheld and paid to the United States Treasury.

Pl.'s MSJ Exs. 3, 5.  In this lawsuit, Mr. McManus is seeking a refund of the $5,220,000

withheld from his 2012 United States gambling winnings.

      Mr. McManus, who claims citizenship in Ireland but lives in Switzerland, argues

that he is entitled to a refund under the Convention between the Government of the

United States of America and the Government of Ireland for the Avoidance of Double

Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income and

Capital Gains, U.S.-Ir., July 28, 1997, S. Treaty Doc. No. 105-31 (amended Sept. 24,

1999) ("the Tax Treaty").  Mr. McManus makes two arguments in support of his refund

claim.  First, Mr. McManus argues, consistent with his refund claim before the Internal

Revenue Service ("IRS"), that because he paid a "domicile levy" to Ireland in 2012, he

was a "resident" of Ireland for purposes of the Tax Treaty.  He argues that as a resident of

Ireland he does not owe taxes on his gambling winnings in the United States.  It is not

disputed that if Mr. McManus was a "resident" of Ireland in 2012 for the purposes of the

Tax Treaty he would be entitled to a refund.  Second, Mr. McManus argues that the

United States tax on gambling winnings violates the Tax Treaty's nondiscrimination

provisions, which Mr. McManus argues apply to nationals of the United States and

Ireland regardless of residence status under the Tax Treaty.  Mr. McManus did not

---

[1] Only Mr. McManus's reported United States gambling income for 2012 is at issue in this case.

advance this discrimination theory before the IRS.  He made it for the first time at the oral argument on the parties' cross-motions for summary judgment.[2]

The government argues in its cross-motion that Mr. McManus is not entitled to a refund.  The government argues that Mr. McManus was not a resident of Ireland in 2012 for the purposes of the Tax Treaty and thus cannot claim a refund on this ground. Relying on correspondence received from the Irish taxing authorities, Ireland's Office of the Revenue Commissioners ("Ireland Revenue"), the government argues that individuals like Mr. McManus who pay only Ireland's "domicile levy" do not qualify as "residents" of Ireland for purposes of the Tax Treaty.  The government further argues that Mr. McManus's nondiscrimination argument is barred under the Federal Circuit's doctrine of "substantial variance," which precludes a tax payer from making arguments based on theories that were not presented in the administrative proceeding before the IRS.  The government argues in the alternative that the United States tax applicable to Mr. McManus's gambling winnings does not violate the nondiscrimination provisions of the Tax Treaty.

For the reasons below, Mr. McManus's motion for summary judgment is **DENIED** and the government's cross-motion for summary judgment is **GRANTED**.

## I.    TAX TREATY

The Tax Treaty between the United States and Ireland was signed July 28, 1997 and ratified later that year.[3]  The purposes of the Tax Treaty, as stated in its title, are "the

---

[2] The court allowed the government to respond to Mr. McManus's nondiscrimination argument in post-argument briefing.

avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income and capital gains."[4]  The Tax Treaty between the United States and Ireland is similar in structure and substance to other tax conventions between the United States and foreign countries and the model tax conventions published by the U.S. Department of Treasury and the Organisation for Economic Co-operation and Development ("OECD"). According to the U.S. Department of Treasury's Technical Explanation of the Tax Treaty, "[n]egotiations took into account the U.S. Treasury Department's current tax treaty policy, the Model Income Tax Convention on Income and on Capital, published by the OECD in 1992 and amended in 1994 and 1995 (the 'OECD Model') and recent tax treaties concluded by both countries."  Department of the Treasury Technical Explanation of the Convention between the Government of the United States of America and the Government of Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains Signed at Dublin on July 28, 1997 and the Protocol Signed at Dublin on July 28, 1997 ("Technical Explanation").  The Department of Treasury's Technical Explanation also states that negotiations took into account drafts of "the U.S. Treasury Department's Model Income

---

[3] The Tax Treaty replaced a prior agreement: the Convention between the Government of Ireland and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income, U.S.-Ir., Sept. 13, 1949, 2 U.S.T. 2303 ("the 1949 Tax Treaty").

[4] According to the Joint Committee on Taxation, the Tax Treaty was "intended to promote close economic cooperation between the two countries and to eliminate possible barriers to trade and investment caused by overlapping taxing jurisdictions of the two countries."  Staff of the Joint Comm. on Taxation, 106th Cong., Explanation of Proposed Income Tax Treaty and Proposed Protocol Between the United States and Ireland 3 (Comm. Print 1997) (Def.'s MSJ Ex. R).

Tax Convention of September 20, 1996, which was issued after negotiation of the [Tax Treaty] was substantially completed."  *Id.*

The Tax Treaty does not directly address the tax treatment of gambling winnings in either country.  Article 22(1) of the Tax Treaty, provides that if income is not dealt with in the Tax Treaty, it is taxable only in the country of residence.  Article 22(1) states: "[i]tems of income beneficially owned by a resident of a Contracting State, wherever arising, not dealt with in the foregoing Articles of this Convention shall be taxable only in that State."[5]  If Mr. McManus is a "resident" of Ireland he would not be subject to tax on his winnings in the United States.  He would be subject to tax on his winnings in Ireland and it is not disputed that Ireland does not tax gambling winnings.[6]

The Tax Treaty defines "resident" in Article 4.  Article 4(1)(a) of the Tax Treaty defines the term "resident of a Contracting State" as "any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, place of management, place of incorporation, or any other criterion of a similar nature."[7]

---

[5] Article 3(1)(h) of the Tax Treaty defines the term "Contracting State" to mean Ireland or the United States.

[6] The OECD Commentary on this provision in the 1992 OECD Model Tax Convention, as amended, states that the rule "applies irrespective of whether the right to tax is in fact exercised by the State of residence, and thus, when the income arises in the other Contracting State, that State cannot impose tax even if the income is not taxed in the first-mentioned State."

[7] The OECD Commentary on Article 4 of the 1992 OECD Model Tax Convention, as amended, states that "[t]he concept of 'resident of a Contracting State' has various functions and is of importance . . . in determining a convention's personal scope of application."  The OECD Commentary further states that "[a]s far as individuals are concerned, the definition aims at covering the various forms of personal attachment to a State which, in the domestic taxation laws, form the basis of a *comprehensive taxation (full liability to tax)*."  (emphasis added).

Generally, "[a]n individual's residence status for Irish tax purposes is determined by the number of days he or she is present in Ireland during a tax year."  Ireland Revenue, RES 1 Leaflet (Def.'s MSJ Ex. F at 4).  Mr. McManus acknowledges that he was not a resident of Ireland in 2012 for the purposes of Ireland's income tax, corporation tax, or capital gains tax, which are also the Irish taxes "covered" under Article 2 of the Tax Treaty along with "any identical or substantially similar taxes . . . imposed after the date of signature of the Convention . . . ."  For the purposes of Ireland's income tax, for example, part 34 of Ireland's Taxes Consolidation Act, 1997 §§ 818-825C (Act No. 39/1997), as amended, sets out the rules of residence for individuals.  *See* Taxes Consolidation Act § 819 (Pl.'s Reply Ex. 40).

At issue in this case is Ireland's "domicile levy," which was enacted in 2010.  *See* Finance Act 2010 § 150 (Act No. 5/2010) (adding part 18C, §§ 531AA-531AK, to the Taxes Consolidation Act).[8]  The "domicile levy" applies to Irish-domiciled individuals who own property in Ireland valued at more than €5 million, whose worldwide income exceeds €1 million, and whose liability for Irish income tax in the relevant tax year was less than €200,000.  *See id.*; *see also* Finance Act 2012 § 136 (Act No. 9/2012)

---

[8] Guidance from Ireland Revenue on Ireland's income tax and capital gains tax liability explains the legal concept of "domicile."  The Ireland Revenue guidance states that the term "domicile" "may, broadly speaking, be interpreted as meaning residence in a particular country with the intention of residing permanently in that country."  Ireland Revenue, RES 1 Leaflet at 6 (Def.'s MSJ Ex. F).  The guidance also states that "[a]n individual's domicile status affects the extent to which foreign sourced income is taxable in the State."  *Id.*  Other guidance from Ireland Revenue on Ireland's income tax states that "[a]n individual who is resident, ordinarily resident and domiciled in the State is liable to income tax in respect of his/her total income wherever arising."  Ireland Revenue, Income Tax - Who Pays? at 1 (Def.'s MSJ Ex. G).  The guidance continues "[a]n individual who is not resident in the State is normally liable to income tax in respect of income arising to him/her in the State.  *Id.*

(amending the 2010 law); Finance Act (No. 3) 2011 §§ 1(2), 5(8), (9)(a), sch. 1 (Act No. 18/2011) (amending the 2010 law); Pl.'s MSJ Ex. 14 (domicile levy form); Def.'s MSJ Ex. J (Ireland Revenue Domicile Levy Information Leaflet noting that "Irish income tax paid by an individual in a tax year will be allowed as a credit in calculating the amount of domicile levy due for that year" and that worldwide income includes "any income exempted under a Double Tax Treaty or deductible for income tax purposes").

The Tax Treaty includes procedures for resolving questions about whether or how the Tax Treaty applies in various situations. The Tax Treaty authorizes the "competent authority" of one state to seek information from the competent authority of the other state. Tax Treaty Art. 26(1). The competent authority for the United States is the Secretary of the Treasury or his delegate, the IRS. Tax Treaty art. 3(1)(e)(i). The competent authority for Ireland is the Revenue Commissioners ("Ireland Revenue") or their authorized representative. Tax Treaty art. 3(1)(e)(ii). Article 26 of the Tax Treaty states that issues may be resolved by "mutual agreement" of the competent authorities," and that the "competent authorities of the Contracting States shall endeavour to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application" of the Tax Treaty.[9] Tax Treaty art. 26(2)-(3). Article 26 further provides that "[t]he competent authorities of the Contracting States may communicate with each other directly for the purpose of reaching an agreement . . . ." Tax Treaty art. 26(4). Arbitration is also available. Tax Treaty art. 26(5).

---

[9] *See, e.g.*, Competent authority agreement regarding the treatment of Irish common contractual funds under the Tax Treaty, Announcement 2006-19, 2006-13 I.R.B. 674.

Article 27 of the Tax Treaty, titled "Exchange of Information and Administrative Assistance," authorizes the competent authorities to seek each other's assistance in carrying out the Tax Treaty.  Article 27 provides that:

> The competent authorities of the Contracting States shall exchange such information as is relevant for carrying out the provisions of this Convention or of the domestic laws of the Contracting States concerning taxes covered by the Convention insofar as the taxation thereunder is not contrary to the Convention, including the assessment or collection of, the enforcement or prosecution in respect of, or the determination of appeals in relation to the taxes covered by the Convention.  The exchange of information is not restricted by Article 1 (General Scope).  Any information received by a Contracting State shall be treated as secret in the same manner as information obtained under the domestic laws of that State and shall be disclosed only to persons or authorities (including courts and administrative bodies) involved in the assessment, collection, or administration of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes covered by the Convention or the oversight of the above.  Such persons or authorities shall use the information only for such purposes.  They may disclose the information in public court proceedings or in judicial decisions.

Tax Treaty art. 27(1).

Finally, with regard to nondiscrimination, Article 25 of the Tax Treaty provides that "[n]ationals of a Contracting State shall not be subjected in the other Contracting State to any taxation . . . which is other or more burdensome than the taxation . . . to which nationals of that other State in the same circumstances are or may be subjected."[10] Article 25 continues that "[t]his provision shall also apply to persons who are not residents of one or both of the Contracting States."  Article 25 further provides that "for

---

[10] There is no dispute that Mr. McManus is a "national" of Ireland under Article 3(1)(i) of the Tax Treaty, which provides that "the term 'national' in relation to a Contracting State, means any citizen of that State and any legal person, association or other entity deriving its status as such from the laws in force in that State."

the purposes of the tax of a Contracting State, a citizen of that Contracting State who is

not a resident of that Contracting State and a citizen of the other Contracting State who is

not a resident of the first-mentioned Contracting State are not in the same

circumstances."[11]

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The facts of this case are not in dispute.  Mr. McManus reported "United States

source income" of $17,400,000 for 2012, of which $5,220,000 was withheld and paid to

the United States Treasury.  *See* Pl.'s MSJ 1, Exs. 3, 5.  Mr. McManus also paid a

€200,000 "domicile levy" to Ireland for 2012.  *See* Masuda Suppl. Decl. Ex. B.  Mr.

McManus's domicile levy form, dated October 24, 2013, lists his address as Crans-

Montana, Switzerland and states that (1) he was domiciled in Ireland in 2012; (2) his

worldwide income for 2012 was more than €1,000,000; (3) his liability to Irish income

tax for 2012 was less than €200,000; and (4) the market value of his Irish property was

more than €5,000,000.  *See* Pl.'s MSJ Ex. 14; Def.'s MSJ Bergmann Decl. Ex. B.  Mr.

McManus did not claim any credit for Irish income tax paid for 2012; therefore, his net

amount payable for the domicile levy was €200,000.  *See* Pl.'s MSJ Ex. 14; Def.'s MSJ

Bergmann Decl. Ex. B.

---

[11] The OECD Commentary on the nondiscrimination provision in the 1992 OECD Model Tax
Convention, as amended, states that "in the same circumstances" refers "in particular with
respect to residence,"  that "a taxpayer who is a resident of a Contracting State and one who is
not a resident of that State are not in the same circumstances," and that "[i]n applying [the
nondiscrimination provision] . . . the underlying question is whether two persons who are
residents of the same State are being treated differently solely by reason of having a different
nationality."

Mr. McManus filed a tax return with the IRS, dated January 7, 2014, claiming a tax refund of the $5,220,000 withheld from his 2012 United States gambling winnings. *See* Pl.'s MSJ Ex. 5.  Using IRS Form 8833, titled "Treaty-Based Return Position Disclosure under Section 6114 or 7701(b),"[12] Mr. McManus stated that his gambling winnings should not be subject to tax in the United States "pursuant to Article 22" and "pursuant to Article 4" of the Tax Treaty, which he claimed overruled or modified the relevant Internal Revenue Code ("IRC") provision.  Pl.'s MSJ Ex. 7.[13]  Mr. McManus listed Ireland as his "country of residence" and stated based on the Article 4 of the Tax Treaty that he "is a resident of Ireland because he is liable to tax under the laws of Ireland by reason of his domicile therein."  *Id.*  He did not claim a right to a refund based on the nondiscrimination provision in the Tax Treaty and he did not reference Article 25 of the Tax Treaty.  Treasury Regulation § 301.6114-1(b)(1) provides that "reporting is specifically required" when a taxpayer takes the position "[t]hat a nondiscrimination provision of a treaty precludes the application of any otherwise applicable Code provision, other than with respect to the making of or the effect of an election under section 897(i) [election by a foreign corporation to be treated as a domestic corporation]."

---

[12] Internal Revenue Code ("IRC") section 6114 provides that, in general, "[e]ach taxpayer who . . . takes the position that a treaty of the United States overrules (or otherwise modifies) an internal revenue law of the United States shall disclose (in such manner as the Secretary may prescribe) such position--(1) on the return of tax for such tax (or any statement attached to such return), or (2) if no return of tax is required to be filed, in such form as the Secretary may prescribe."  IRC section 7701(b) defines the terms "resident alien" and "nonresident alien."

[13] In the United States, the gambling income of a nonresident alien individual such as Mr. McManus is generally taxable under IRC section 871(a)(1).  *See Free-Pacheco v. United States*, 117 Fed. Cl. 228, 257 (2014); *Barba v. United States*, 2 Cl. Ct. 674, 680 (1983).

On July 7, 2015, Douglas W. O'Donnell, Deputy IRS Commissioner and the representative of the competent authority for the United States, requested assistance "[i]n accordance with the exchange of information provisions" of the Tax Treaty from [. . .],[14] Assistant Director at Ireland's Office of the Revenue Commissioners and representative of Ireland's competent authority, in connection with the IRS's investigation of Mr. McManus's tax return.  Masuda Suppl. Decl. Ex. A.  Mr. O'Donnell's July 7, 2015 letter explained Mr. McManus's tax refund claim.  In his explanation of the "relevance of the information to the examination or investigation," Mr. O'Donnell stated the definition of "resident of a Contracting State" under Article 4(1) of the Tax Treaty and stated that "[i]f [Mr. McManus] is a tax resident of Ireland, the United States-Ireland Tax Treaty applies and the gambling winnings would not be considered taxable in the United States; therefore, [Mr. McManus] would be entitled to a full refund of the $5,220,000 withholding amount."  *Id.*  Mr. O'Donnell then asked [. . .] for the following specific information: (1) whether Mr. McManus filed a domicile levy form with Ireland Revenue for 2012 and, if so, how much he paid; (2) whether Mr. McManus filed an income tax form with Ireland Revenue and, if so, how much income tax he paid and how much of the domicile levy was set off by the income tax credit; and (3) "[i]f [Mr. McManus] was only assessed the Ireland [Domicile] Levy for the 2012 tax year, please provide an assurance that the Ireland [Domicile] Levy does not entitle [Mr. McManus] to receive treaty

---

[14] The government requested redaction of the representative's name pursuant to IRC § 6105, which restricts the disclosure of "tax convention information."

benefits as an Irish resident pursuant to Article 4 of the United States-Ireland Tax

Treaty." *Id.*

[. . .], the representative of the competent authority of Ireland, responded to Mr.

O'Donnell in a letter dated July 20, 2015.  Masuda Suppl. Decl. Ex. B.  In [. . .] July 20,

2015 letter, [. . .] stated that [. . .] was "in a position to confirm the following" based on

Irish Revenue records:  First, [. . .] stated that "John P McManus paid the Domicile Levy

of €200,000.00 for 2012." *Id.*  Second, [. . .] stated that "John P McManus did not make

an income tax return in Ireland for 2012.  He has not been registered for income tax or

capital gains tax in Ireland since 1995." *Id.*  Lastly, "[t]rusting that this clarifies matters,"

[. . .] stated that "[t]he payment of the Domicile Levy does not entitle John P McManus to

receive treaty benefits in accordance with the provisions in the Ireland-USA Double

Taxation Convention.  The Domicile Levy is not a covered tax for the purposes of this

Convention." *Id.*[15]

Mr. McManus filed his original complaint in this court on August 31, 2015 and an

amended complaint on December 29, 2015 (ECF No. 8).  The government filed its

answer to the amended complaint on January 29, 2016 (ECF No. 13).  Mr. McManus

filed his motion for summary judgment on April 25, 2016 (ECF No. 18).  The

government filed its response to Mr. McManus's motion for summary judgment and

---

[15] In response to questions from the Irish legislature in June 2016 regarding whether "the payment of a domicile levy here [in Ireland] enables a person to claim exemption from tax liability in the United States of America under the double taxation clauses in the 1997 treaty between the two countries," Ireland's Minister for Finance stated that "[i]t has been the view of Revenue, since its introduction in 2010, that the domicile levy could not be regarded as a tax covered by that treaty."  915 No. 2 Dáil Deb. (June 28, 2016) (written answer to questions 89-90) (Def.'s Reply Ex. S).

cross-motion for summary judgment on June 1, 2016 (ECF No. 22).  On June 20, 2016,

Mr. McManus filed his reply in support of his motion and response to the government's

cross-motion for summary judgment (ECF No. 25).  The government filed its reply in

support of its cross-motion for summary judgment on July 21, 2016 (ECF No. 32) and a

notice of additional authority on August 19, 2016 (ECF No. 35).

The court heard oral argument on the parties' cross-motions for summary

judgment on October 18, 2016.  Following oral argument, the government filed under

seal unredacted copies of the letters between the competent authorities of the United

States and Ireland (ECF No. 42).  The parties also submitted supplemental briefing,

which was completed on November 30, 2016 (ECF Nos. 44, 46, 47).

## III.   JURISDICTION AND LEGAL STANDARDS

This court has jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1), to hear

claims for a refund of tax alleged to have been erroneously or illegally assessed or

collected.  *See RadioShack Corp. v. United States*, 566 F.3d 1358, 1360 (Fed. Cir. 2009);

*Hinck v. United States*, 64 Fed. Cl. 71, 74-76 (2005) (citations omitted), *aff'd*, 446 F.3d

1307 (Fed. Cir. 2006), *aff'd*, 550 U.S. 501 (2007).[16]

Pursuant to RCFC 56, summary judgment is appropriate when "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

---

[16] Pursuant to 26 U.S.C. § 7422(f), a tax refund suit may be maintained against the United States in this court notwithstanding the provisions of 28 U.S.C. § 1502, which states that this court "shall not have jurisdiction of any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations."

of law."  The parties agree that there are no material facts in dispute and that the case turns solely on interpretation of the Tax Treaty.

The court's role in interpreting a treaty "is limited to giving effect to the intent of the Treaty parties."  *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982). The court must "read the treaty in a manner 'consistent with the shared expectations of the contracting parties.'"  *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1232-33 (2014) (quoting *Olympic Airways v. Husain*, 540 U.S. 644, 650 (2004)).  The Supreme Court and the Federal Circuit have held that when interpreting a treaty, "[t]he clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" *United States v. Stuart*, 489 U.S. 353, 365-66 (1989) (quoting *Sumitomo*, 457 U.S. at 180); *Nat'l Westminster Bank, PLC v. United States*, 512 F.3d 1347, 1353 (Fed. Cir. 2008) (same).  The Supreme Court and the Federal Circuit have also "relied on expressions of intent in diplomatic correspondence" that reveal the intent of the treaty parties.  *Coplin v. United States*, 761 F.2d 688, 691-92 (Fed. Cir. 1985) (citing *Sumitomo Shoji Am.*, 457 U.S. at 184 n.9), *aff'd on other grounds sub nom., O'Connor v. United States*, 479 U.S. 27 (1986).  The Federal Circuit has also held that "when the language of a treaty provision 'only imperfectly manifests its purpose,'" courts "must 'examine not only the language, but the entire context of agreement.'"  *Nat'l Westminster Bank*, 512 F.3d at 1353 (quoting *Great-West Life Assur. Co. v. United States*, 230 Ct. Cl. 477, 678 F.2d 180, 183 (1982))).  In *National Westminster Bank*, *id.*, the Federal Circuit explained that the "entire context" of a tax treaty can be "informed by, and . . . based on," the

OECD Model Tax Convention and Commentary available at the time the tax treaty was negotiated, as described in the Department of Treasury's technical explanation of the tax treaty.

## IV.   DISCUSSION

> **A.   Mr. McManus's 2012 United States Gambling Winnings are not Exempt from Taxation in the United States under Article 22 of the Tax Treaty because Mr. McManus was Not a Resident of Ireland in 2012 for the Purposes of the Tax Treaty under Article 4.**

The parties agree that under Article 22 of the Tax Treaty, Mr. McManus's 2012 United States gambling winnings would not be taxable in the United States if Mr. McManus was a "resident of a Contracting State" in 2012 for the purposes of the Tax Treaty.  Article 4(1)(a) of the Tax Treaty defines the term "resident of a Contracting State" as "any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, place of management, place of incorporation, or any other criterion of a similar nature."

Relying on the plain language of Article 4(1)(a) of the Tax Treaty, Mr. McManus argues that he was a "resident" of Ireland in 2012 because he paid Ireland's domicile levy in 2012 and was thus "liable to tax" in Ireland "by reason of his domicile."  Mr. McManus asserts that Ireland's domicile levy applies to individuals who have a significant connection to Ireland based on Irish property ownership greater in value than €5 million and thus paying the domicile levy should make Mr. McManus a "resident" of Ireland for purposes of Articles 4 and 22 of the Tax Treaty.  Mr. McManus also argues that Ireland's domicile levy is a tax within the contemplation of the OECD Model Tax

Convention and Commentary regarding Article 4.  The OECD Model Tax Convention and Commentary explains that "residents" for purposes of Article 4 are persons subject to "full" or "comprehensive" taxation in the contracting state.  *See* OECD Commentary on Article 4 of the 2010 OECD Model Tax Convention (Pl.'s Reply Ex. 37 at 85); *see also* American Law Institute, International Aspects of United States Income Taxation II: United States Income Tax Treaties, at 127-28 (1992) (stating that, to be "fully taxable" in a country, a taxpayer must be "fully subject to its plenary taxing jurisdiction," and the taxpayer will not qualify unless "that country asserts an unlimited right to tax his or its income") (Def.'s MSJ Ex. O).  Mr. McManus argues that the domicile levy is a full and comprehensive tax in that it was based in part on his worldwide income.  In this connection, Mr. McManus relies on the treatise of the Irish Tax Institute, Double Taxation Agreements 105, Conor O'Brien, ed. (6th ed. 2011) (Pl.'s MSJ Ex. 23), which states, "[r]egardless of the fact that [Ireland's domicile levy] is levied as a fixed charge, this tax is substantially similar to income tax and should be treated as a tax covered by Ireland's treaties given that its payment is expressly linked to an individual's level of income."

Finally, Mr. McManus argues that the court should disregard Ireland Revenue's letter to the IRS which states that Mr. McManus is not entitled to the benefits provided by the Tax Treaty to "residents" of Ireland based on his payment of Ireland's domicile levy. Mr. McManus argues that the Ireland Revenue letter went beyond the scope of the Tax Treaty.  Specifically, Mr. McManus asserts that Article 27 of the Tax Treaty limits exchanges of information to those "concerning taxes covered by the Convention" and, as

Ireland Revenue stated in the July 20, 2015 letter, the domicile levy is not a "covered" tax under Article 2 of the Tax Treaty.  Pl.'s MSJ 18-20.[17]

The government argues that Mr. McManus is not entitled to a refund under Articles 4 and 22 of the Tax Treaty because he was not a "resident of a Contracting State" in 2012 for the purposes of the Tax Treaty.  The government argues that the letter it received from Ireland Revenue, stating that "[t]he payment of the Domicile Levy does not entitle John P McManus to receive treaty benefits in accordance with the provisions in the Ireland-USA Double Taxation Convention," Masuda Suppl. Decl. Ex. B, was proper under the Tax Treaty and is dispositive in that it reflects the shared understanding of the parties to the Tax Treaty.  The government argues that the IRS properly sought information and advice from Ireland Revenue under Articles 26 and 27 of the Tax Treaty to confirm with Ireland Revenue its interpretation that Mr. McManus's payment of Ireland's domicile levy in 2012 did not entitle him to receive treaty benefits, with regard to taxation in the United States, as a resident of Ireland pursuant to Article 4 of the Tax Treaty.  As noted above, Article 26 of the Tax Treaty allows the IRS and Ireland Revenue to communicate to resolve "difficulties or doubts arising as to the interpretation or

---

[17] Mr. McManus also argued that the court should not consider the letter from Ireland Revenue on the grounds that the letter has no probative value on the grounds that it had not been authenticated and should be treated as hearsay under the Federal Rules of Evidence.  Pl.'s Reply 36.  Mr. McManus speculated that the letter could have been the work of "rogue Irish tax agents, [who] have a vendetta against Mr. McManus."  Pl.'s MSJ 15.  The court finds that these concerns have been alleviated by the government's filing, under seal, of an unredacted copy of the letter which shows that it was written by an authorized representative of Ireland's competent authority.  *See* Masuda Suppl. Decl. Ex. B; *see also* RCFC 44.1 (providing that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence").

application" of the Tax Treaty.  Article 27 allows these authorities to exchange information.

The government also argues that its position and Ireland Revenue's statements regarding the domicile levy are consistent with the international understanding of Article 4 in tax conventions like the one in this case.  According to the government, Ireland's domicile levy, unlike Ireland's income tax, does not qualify as "comprehensive" or "full" taxation as contemplated by the OECD Commentary because the domicile levy is capped at €200,000 regardless of the Irish property owner's worldwide income over €1 million, and does not by its terms subject the Irish property owner to Ireland's plenary taxing jurisdiction akin to Ireland's income tax, for example.[18]  In this regard, the government notes that Ireland's Minister for Finance has stated to the Irish legislature that Ireland's domicile levy is a "wealth tax . . . aimed at high wealth individuals with a substantial

_____

[18] In *R. v. Crown Forest Industries Ltd.*, [1995] 2 S.C.R. 802 (Can.) (Def.'s MSJ Ex. M), the United States argued that a company incorporated in the Bahamas with its place of management in the United States was not a resident of the United States for the purposes of the Tax Treaty between the United States and Canada because the company was subject to taxation in the United States only on its United States source income.  Def.'s MSJ Ex. N ("Factum of the Intervener United States").  Although the convention stated that a "resident of a contracting state" included "any person [or entity] who, under the laws of that state, is liable to tax therein by reason of . . . place of management," and did not expressly exclude persons liable to tax only on income from sources in that State or of profits attributable to a permanent establishment in that State (unlike Article 4(2) of the Tax Treaty in this case), the Supreme Court of Canada looked to the intentions of the drafters and other extrinsic materials and found that to be a resident of a contracting state for the purposes of the convention, a taxpayer had to be "*subject to as comprehensive a tax liability as is imposed by a state*," which in that case meant taxation on worldwide income rather than taxation on only some portion of income or "source liability." *Crown Forest* ¶¶ 2, 40 (emphasis added).  Because the company's place of management was "only one factor in the determination of whether" the company was liable to taxes in the United States, and the United States did not assert jurisdiction to tax income which was not effectively connected to the company's operations in the United States, the Supreme Court of Canada found that the company was not a resident of the United States for the purposes of the U.S.-Canada tax convention. *Id.* ¶¶ 29, 68.

connection to Ireland, *regardless of whether they are tax resident*." 244 Seanad Deb.

(Dec. 10, 2015) (Def.'s MSJ Ex. L at 8) (emphasis added). For all of these reasons, the

government asserts that Mr. McManus was not a "resident" of Ireland in 2012 for

purposes of the Tax Treaty and is thus not entitled to a refund of taxes withheld from his

2012 United States gambling winnings.

The court agrees with the government that Mr. McManus's payment of Ireland's

domicile levy in 2012 did not make him a resident of Ireland for purposes of Article 4 of

the Tax Treaty and thus he is not entitled to a refund pursuant to Article 22 of the Tax

Treaty. First, the court does not accept Mr. McManus's contention that because he paid a

levy based on his domicile in Ireland he has met the criteria to be a "resident" under the

plain language of Article 4 of the Tax Treaty. Article 4 cannot be read in a vacuum. In

particular, it must be read in context and "consistent with the shared expectations" and

intent of the treaty parties. *Lozano*, 134 S. Ct. at 1232-33 (citation omitted); *see also*

*Coplin*, 761 F.2d at 691-92 (citations omitted). To be a "resident of a Contracting State"

under Article 4(1)(a) of the Tax Treaty, a person must be "under the laws of that State . . .

liable to tax therein by reason of his domicile . . . or any other criterion of a similar

nature." The OECD Commentary concerning Article 4 of the 1992 OECD Model Tax

Convention, as amended, states that to be "liable to tax" under Article 4, a person must be

subject to comprehensive or full taxation, such as an income tax on the full amount of the

person's worldwide earnings. Specifically, the OECD Commentary states that "[a]s far

as individuals are concerned, the definition aims at covering the various forms of

personal attachment to a State which, in the domestic taxation laws, form the basis of a

*comprehensive taxation (full liability to tax)*" (emphasis added).  Here, as the government

argues, Ireland's domicile levy, which is capped at €200,000 regardless of worldwide

income over €1 million, is not "comprehensive" or "full" in that it is not a comprehensive

tax on a person's worldwide income.  Ireland's domicile levy is not as Mr. McManus

asserts "substantially similar" to Ireland's income tax.  To the contrary, as previously

noted, Ireland's Minister for Finance has described Ireland's domicile levy is a "wealth

tax" which applies to wealthy Irish individuals "*regardless of whether they are tax

resident*" and subject to Ireland's income tax for example.  244 Seanad Deb. (Dec. 10,

2015) (Def.'s MSJ Ex. L at 8) (emphasis added).  Indeed, the domicile levy is applicable

only to individuals who pay less than €200,000 in income tax in Ireland and those

individuals may receive a credit for income tax paid.  *See* Pl.'s MSJ Ex. 14 (domicile

levy form).[19]  Ireland's domicile levy is distinct from, not substantially similar to,

Ireland's income tax.[20]  Mr. McManus does not dispute that he has not paid any income

tax or capital gains tax in Ireland since at least 1995.  *See* Masuda Suppl. Decl. Ex. B.[21]

---

[19] An Ireland Revenue Domicile Levy Information Leaflet also distinguishes Ireland's domicile
levy from Ireland's income tax, stating that "Irish income tax paid by an individual in a tax year
will be allowed as a credit in calculating the amount of domicile levy due for that year."  Def.'s
MSJ Ex. J (also noting that in the context of the domicile levy worldwide income includes "any
income exempted under a Double Tax Treaty or deductible for income tax purposes").

[20] Mr. McManus's argument that his non-payment of income tax in Ireland should not be
considered because under the Tax Treaty a person could be liable to comprehensive taxation in a
state even if the state does not in fact impose tax on the person, Pl.'s Reply 15, is without merit.
Mr. McManus cites the OECD Commentary on Article 4 the 2010 Model Tax Convention which
states that "[i]n many States, a person is considered liable to comprehensive taxation even if the
Contracting State does not in fact impose tax."  2010 OECD Commentary at 85 (providing as
examples charities and pension funds that meet standards for tax exemptions) (Pl.'s Reply Ex.
37).  However, the quoted 2010 OCED Commentary refers to pension funds and charitable
organizations that are generally "subject to the tax laws of a Contracting State" but "exempt only

Further, contrary to Mr. McManus's contentions, this court cannot ignore the fact that the parties to the Tax Treaty have concluded that Mr. McManus's payment of Ireland's domicile levy in 2012 does not qualify him as a "resident" of Ireland under Article 4.  The court must look to the shared understanding of the treaty parties when construing a tax treaty.  *See Lozano*, 134 S. Ct. at 1232-33; *Coplin*, 761 F.2d at 691-92.

As discussed, the IRS requested assistance from Ireland Revenue and received a response from Ireland Revenue.  After laying out the definition of "resident of a Contracting State" under Article 4(1) of the Tax Treaty, the IRS explained that "[i]f [Mr. McManus] is a tax resident of Ireland, the United States-Ireland Tax Treaty applies and the gambling winnings would not be considered taxable in the United States; therefore,

---

if they meet all of the requirements for exemption specified in the tax laws." *Id.*  In this case, it is undisputed that Mr. McManus was not generally subject to the tax laws of Ireland, such as Ireland's income tax, in the first place based on the number of days he was present in Ireland.  In contrast to certain pension funds and charitable organizations, Mr. McManus was not generally subject to the tax laws of Ireland and then exempt from those tax laws based on meeting specific requirements.  Moreover, the Tax Treaty expressly addresses this issue: Article 4(1)(c) provides that the term "resident of a Contracting State" includes "a pension trust and any other organization established in that State and maintained exclusively to administer or provide retirement or employee benefits that is established or sponsored by a person that is otherwise a resident under Article 4 (Residence)" and, with certain restrictions, "any charitable or other exempt organization."  Because the Tax Treaty directly addresses when an entity is "liable to tax" and a "resident of a contracting state" despite being exempt from domestic tax laws, and does not include a person in Mr. McManus's circumstances, the court finds that Mr. McManus was not "liable to tax" and a "resident" of Ireland in 2012 under Article 4 of the Tax Treaty.

[21] Because the court finds that Mr. McManus was not a resident of Ireland in 2012 for the purposes of the Tax Treaty on the grounds that the domicile levy did not make Mr. McManus "liable to tax" in Ireland in 2012, *see* Tax Treaty art. 4(1), the court does not reach the government's argument that Mr. McManus was not a resident of Ireland for the purposes of the Tax Treaty on the grounds that Mr. McManus was not liable to tax "by reason of his domicile . . . or any other criterion of a similar nature" or that Mr. McManus was "liable to tax in [Ireland] in respect only of income from sources in that State or of profits attributable to a permanent establishment in that State."  *See* Tax Treaty art. 4(1)-(2).

[Mr. McManus] would be entitled to a full refund of the $5,220,000 withholding amount." *Id.* To resolve the issue, the IRS asked Ireland Revenue for "an assurance that the Ireland [Domicile] Levy does not entitle [Mr. McManus] to receive treaty benefits as an Irish resident pursuant to Article 4 of the United States-Ireland Tax Treaty." *Id.* In response to the IRS's questions, Ireland Revenue stated that "[t]he payment of the Domicile Levy does not entitle John P McManus to receive treaty benefits in accordance with the provisions in the Ireland-USA Double Taxation Convention. The Domicile Levy is not a covered tax for the purposes of this Convention." *Id.*[22]

The court finds that Mr. McManus's objections to Ireland Revenue's response to the IRS are without merit. Mr. McManus argues that Ireland Revenue's response to the IRS should be disregarded because it was outside the scope of Article 27 of the Tax Treaty on the grounds that Ireland Revenue discussed a tax not covered by the Treaty. The court disagrees. Mr. McManus's argument is inconsistent with Articles 26 and 27, which were written to encourage the IRS and Ireland Revenue to confer with each other and exchange information in order to reach agreement on when and how the Tax Treaty applies. The court finds that Ireland Revenue's response to the IRS is expressly contemplated by Articles 26 and 27 of the Tax Treaty. Article 26 states that issues may be resolved by "mutual agreement" of the competent authorities," and that the

---

[22] This is consistent with the statement by Ireland's Minister for Finance that "[i]t has been the view of Revenue, since its introduction in 2010, that the domicile levy could not be regarded as a tax covered by that treaty." 915 No. 2 Dáil Deb. (June 28, 2016) (written answer to questions 89-90) (Def.'s Reply Ex. S).

"competent authorities of the Contracting States shall endeavor to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application" of the Tax Treaty.  Tax Treaty art. 26(2)-(3).  Article 26 further provides that "[t]he competent authorities of the Contracting States may communicate with each other directly for the purpose of reaching an agreement . . . ."  Tax Treaty art. 26(4).  Article 27 also authorizes the IRS and Ireland Revenue to "exchange such information as is relevant for carrying out the provisions of this Convention or of the domestic laws of the Contracting States concerning taxes covered by the Convention . . . ."  While the domicile levy is not itself an Irish tax "covered" under Article 2 of the Tax Treaty, the purpose of the IRS's request was to confirm that Mr. McManus's payment of Ireland's domicile levy did not make his taxation in the United States "contrary to the Convention."  Mr. McManus himself claimed to the IRS in the first instance that his payment of Ireland's domicile levy made him a resident of Ireland under Article 4 of the Tax Treaty and entitled him to benefits under Article 22 of the Tax Treaty.  The IRS properly sought to determine whether the Irish domicile levy could entitle Mr. McManus to the benefits of the Tax Treaty, in particular with regard to his claim for a refund of the tax withheld from his 2012 United States gambling winnings, and Ireland Revenue properly responded under Articles 26 and 27 of the Tax Treaty.

In sum, none of Mr. McManus's arguments regarding his claim for a refund based on Articles 4 and 22 of the Tax Treaty have merit.  The court finds that Mr. McManus's payment of the domicile levy alone did not make him a resident of Ireland in 2012 for the

purposes of Article 4 of the Tax Treaty and thus his claim for a refund based on Article 22 is denied.

### B.    Mr. McManus's Nondiscrimination Argument is Barred by the Substantial Variance Rule.

The government argues that Mr. McManus's nondiscrimination argument based on Article 25 of the Tax Treaty is barred by the doctrine of "substantial variance." The government asserts that because Mr. McManus cited only Article 22 of the Tax Treaty in his administrative tax refund claim before the IRS he cannot now argue that he is entitled to a refund based on violations of Article 25 of the Tax Treaty.

The court agrees with the government that Mr. McManus is barred by the substantial variance doctrine from making his treaty nondiscrimination argument before this court. IRC section 7422(a) requires a taxpayer to have filed a refund claim in the manner prescribed by regulation. Treasury Regulation § 301.6402–2(b)(1) provides that "[t]he claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." The Federal Circuit has found that these provisions state a "'substantial variance' rule that bars taxpayers from bringing new claims or facts not alleged in the refund application to a court in which suit for refund is sought." *Lua v. United States*, 843 F.3d 950, 957 (Fed. Cir. 2016) (citing *Cencast Servs., L.P. v. United States*, 729 F.3d 1352, 1366 (Fed. Cir. 2013); *Lockheed Martin Corp. v. United States*, 210 F.3d 1366, 1371 (Fed. Cir. 2000)). Under the substantial variance rule, "[f]or a theory, claim, or fact supporting the application for refund to be admissible in a suit, we ask 'whether there [wa]s a substantial

variance from a timely filed claim.'" *Id.* (quoting *Computervision Corp. v. United States*, 445 F.3d 1355, 1364 n.8 (Fed. Cir. 2006)).  The Federal Circuit has noted that this rule "(1) gives the IRS notice as to the nature of the claim and the specific facts upon which it is predicated; (2) gives the IRS an opportunity to correct errors; and (3) limits any subsequent litigation to those grounds that the IRS had an opportunity to consider and is willing to defend." *Lockheed Martin*, 210 F.3d at 1371 (citing *Ottawa Silica Co. v. United States*, 699 F.2d 1124, 1138-40 (Fed. Cir. 1983); *Union Pac. R.R. v. United States*, 389 F.2d 437, 442 (Ct. Cl. 1968)).

In this case, the substantial variance doctrine is particularly relevant in that Treasury Regulation § 301.6114-1(b)(1) expressly requires taxpayers to specifically identify claims based on tax treaty nondiscrimination provisions to the IRS.  Treasury Regulation § 301.6114-1(b)(1) provides that "reporting is specifically required" when a taxpayer takes the position "[t]hat a nondiscrimination provision of a treaty precludes the application of any otherwise applicable Code provision, other than with respect to the making of or the effect of an election under section 897(i) [election by a foreign corporation to be treated as a domestic corporation]."

It is undisputed that Mr. McManus did not identify the Tax Treaty's nondiscrimination provisions to the IRS when he sought a refund of the tax withheld from his 2012 United States gambling winnings.  Mr. McManus based his tax refund claim solely on Articles 4 and 22 of the Tax Treaty.  *See* Pl.'s MSJ Exs. 5, 7.  Indeed, Mr. McManus raised his nondiscrimination argument for the first time at oral argument on the parties' cross-motions for summary judgment.  As a consequence, the IRS did not have

the opportunity to address the issue, including, as described in Articles 26 and 27 of the Tax Treaty, the opportunity to exchange information with Ireland Revenue regarding the matter. *See Lockheed Martin*, 210 F.3d at 1371. Mr. McManus's arguments in this court are therefore limited "to those grounds that the IRS had an opportunity to consider and is willing to defend." *Id.* Mr. McManus's arguments based on the nondiscrimination provision of the Tax Treaty raised for the first time at oral argument on his motion for summary judgment are barred.[23]

## V. CONCLUSION

For the reasons stated above, Mr. McManus's motion for summary judgment is **DENIED**. The government's cross-motion for summary judgment is **GRANTED**. The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge

---

[23] Because Mr. McManus's nondiscrimination claim is barred, the court does not reach the merits of the argument.